[Philadelphia, March 30, 1832.]

## CRAIG *against* CRAIG.

### IN ERROR.

The mere possession of a bond by one of several co-obligors, is no evidence that he has paid the whole debt.

Therefore, in an action by one co-obligor who alleged he had paid the whole debt, against the other for contribution, where the joint liability of the plaintiff and defendant was admitted, it was *held* to be error to permit the bond to be given in evidence by the plaintiff to prove that he had paid the whole debt.

The declarations of a third person, as to a disputed fact, made in the presence of both parties, is evidence, though not conclusive, against a party who has consented to submit the fact to his decision; even where such third person is capable of being examined as a witness.

This case came before the court on a writ of error to the court of Common Pleas of *Northampton* county.

From the record, which was returned with three bills of exceptions to the opinion of the court below on points of evidence, it appeared, that *Charles Craig*, the defendant in error, brought this action of assumpsit against his brother *Thomas Craig jun.* the plaintiff in error, to recover the proportion alleged to be due from him of two bonds, in which they were jointly bound to their father General *Thomas Craig*, the whole of which *Charles* alleged he had paid.

On the trial in the court of Common Pleas, the plaintiff, after having proved the execution of the bonds, and the hand writing of the

(Craig *v.* Craig.)

obligee to certain endorsements on them, offered in evidence both the bonds and the endorsements, for the purpose of proving the original liability of the plaintiff and defendant as co-obligors, and that he, the plaintiff, had discharged the debt. Their admission was objected to by the defendant's counsel, because in that stage of the cause the bonds were not evidence to prove any other fact than the joint liability of the plaintiff and defendant to the obligee, which was admitted, and because the endorsements were not as good evidence as the oath of the obligee who ought to have been produced. The court rejected the endorsements, but admitted the bonds in evidence, because their execution had been proved; adding, that " the circumstance of their having been delivered up to the plaintiff should have its proper weight in the decision of the cause." The opinion of the court on this point, formed the subject of the first bill of exceptions.

In the course of the trial, the plaintiff called as a witness *Jacob Stem,* who testified that he and two other persons were chosen by *Charles Craig* and *Thomas Craig jun.* to settle the matters in dispute between them. The referees met at the house of *Charles Craig* at the *Lehigh* water-gap, on the 23rd *December,* 1823, when the plaintiff and defendant and General *Thomas Craig* attended. *Charles* produced two or three bonds which were not then due, and *Thomas* objected to having any thing to do with them. He said he was not willing to pay any thing on these bonds as *Charles* had not given any thing for them. General *Craig* then said, that he was satisfied, or that *Charles* had satisfied him for these bonds. The referees did not take into consideration any bonds that were not then due, and they were handed back to *Charles.* By the consent of the parties General *Craig* was examined before the referees without oath. On his cross-examination the witness said, that he was sure the word used by General *Craig* was " *satisfied;*" he said nothing about payment.

Dr. *John Boyd,* who was also examined as a witness on the part of the plaintiff, stated, that in the course of the summer of 1828 he called on *Thomas Craig jun.* to endeavour to settle the dispute between him and his brother *Charles.* *Thomas* said he was not willing to pay *Charles* for these bonds, because he had never paid his father any thing for them; and added, in substance, that he was willing to leave it to his father's decision. The witness went on to state, that sometime after, a meeting took place at *Allentown* between General *Craig,* his two sons, *Frederick Hyneman* and the witness, for the purpose of settling the dispute relative to the bonds, when General *Craig* acknowledged unhesitatingly, that he had received full payment from his son *Charles* of the bond payable 1st of *May,* 1824. Here the counsel for the defendant interposed, and objected to evidence being given of any declarations by General *Craig* on this occasion, or of any part of the transaction except so far as it consisted of the acts and declarations of *Thomas Craig jun.* The court, after argument, decided, that inasmuch as *Thomas Craig jun.* had declared to the witness that he was willing to leave the matter to his father's decision, and inas-

(Craig v. Craig.)

much as the transaction proposed to be given in evidence, was a general conversation, at which the defendant was present, and in which he participated, they would permit the whole of the transaction, so long as *Charles Craig jun.* was present, to go to the jury. This decision was the basis of the second bill of exceptions.

The witness then proceeded to state, that *Charles Craig* produced a number of documents to show that he had paid his father for the other two bonds. *Charles* alleged that he had at one time paid one hundred and eighty-five dollars, for which he produced a receipt: That he had given his father his note dated 4th of *November* 1823, for two hundred and fifteen dollars, which he had paid off at different times. That Mrs. *Greenleaf* paid General *Craig* ninety dollars for rails sent down the river by *Charles Craig*, to be disposed of, towards the payment of the bonds. That he had sent his father, at one time twenty-five dollars by *Jacob Bussell*, and had given Mrs. *Kramer*, the general's daughter, with whom he resided, forty-five dollars, also on account of the bonds. General *Craig*, the witness stated, assented to these payments. *Thomas* grumbled a good deal and asked his brother *Charles* where he got all the money to make these payments. *Charles* said he could tell him if it was necessary and mentioned having received money from different places which the witness did not recollect. *Thomas* said he would never pay a cent of these bonds; he had paid his father long ago and had his receipts for the payment. The general said he was very sorry any dispute had arisen between his sons, and if he had the money he would pay *Charles* himself. *Charles* said he had laid out thirty-five dollars for his father in his quarrels with *Charles Hutter*, to which the general assented; he said nothing, and, the witness added, silence gives consent. General *Craig*, he said, acknowledged unhesitatingly that he had received full payment for the bond of 1824, and that the referees had nothing to do with the bonds of 1826 and 1827, and the payments before mentioned applied to them. The witness then exhibited a paper showing the conclusion to which they came and the report they made on the subject.

On his cross-examination he stated, that *Charles* was not present when *Thomas* agreed to be bound by the decision of his father: That *Charles* had not expressly authorised him to make an agreement with *Thomas* to that effect, but he had told *Charles* he would call on *Thomas* and try to settle the matter; he interfered solely as a friend. He did not recollect that General *Craig* denied the assertion of *Thomas* that he had paid more than he had ever received on these bonds. The witness added, that they took into consideration the bond of 1827 for two hundred dollars. *Charles* applied the items referred to, to the bonds of 1826 and 1827. On being re-examined he stated, that *Charles Craig* said, when he called upon him, he would be very glad, if the witness would undertake to settle the matter between him and *Thomas*.

The third bill of exceptions, which was also taken by the defend-

(Craig *v.* Craig.)

ant's counsel, was to the admission by the court below, of the deposition of *Frederick Hyneman,* who swore, that at the request of General *Craig* he proposed to *Charles Craig* a reference of the dispute said to exist between him and his son *Charles,* relative to the consideration paid to him for certain bonds, given by *Charles* and *Thomas Craig jun.* to their father.  *Charles* agreed to the reference, and the deponent and Dr. *John Boyd* were appointed referees.  The parties and referees met, but adjourned to obtain the attendance of *Thomas Craig jun.*  After *Charles* was gone, on the day of the first meeting the deponent saw *Thomas Craig jun.* who informed him, that if General *Craig* would say, that he had received the amount of the bonds of *Charles,* he, *Thomas,* was ready and willing to pay his share.  The deponent subsequently sent *Thomas Craig jun.* notice of the time and place of the second meeting.  He appeared according to the notice. General *Craig, Thomas Craig jun, Charles Craig,* Dr. *Boyd* and the deponent met at General *Craig's* room at Mr. *Kramer's,* where the referees examined the accounts and vouchers.  The brothers disagreed.  General *Craig* after examining the papers and vouchers admitted the endorsements on the bonds to be in his hand writing. The bond payable 1st of *May,* 1824, he at once gave up and said he was satisfied as to that bond being paid.  The only difference between *Charles* and him was as to the bonds payable in 1826 and 1827.  He acknowledged he had given up the bonds to *Charles,* but disagreed as to the time and place: General *Craig* said his memory was bad.  That the endorsements were in his hand-writing.  That he remembered several sums of money he had got of *Charles,* especially ninety dollars which he received through Mrs. *Greenleaf* and some money through Mrs. *Kramer.*  *Thomas* then said he had paid money also.  This the General did not remember, *Thomas* said he had receipts, which the general asked him to produce.  He said they were at *Easton.*  When the amounts were stated, for which *Thomas* said he had receipts, the general laughed and said he had never received it; he never had so much money.  *Thomas* became angry and left the referees, who made out and signed an award which was read to General *Craig.*  He expressed himself satisfied with it, and said, that when he got his money from the *United States* he would sooner pay it himself than go to court.

On the return of the record to this court, the following errors were assigned in the opinion of the court below.

*First.* It was error, after rejecting the indorsements on the bonds, to permit the bonds themselves to go to the jury.

*Second.* It was error to decide, in that stage of the trial that the circumstance of the bonds being delivered up to the plaintiff below "should have its proper weight in the decision of the cause."

*Third.* It was error to admit the testimony of *John Boyd* and *Jacob Stem* and the deposition of *Frederick Hyneman* as to General *Craig's* declarations, though they were made in the presence of *Thomas Craig jun.*

(Craig *v.* Craig.)

*Fourth.* It was error to admit any other evidence of the payment of money or making satisfaction for the bonds by *Charles Craig* to General *Craig*, than the testimony of General *Craig* himself, as it does not appear that his attendance could not have been procured.

*Jones* and *Rawle* for the plaintiff in error.

1. If the plaintiff below had really paid to the obligee the amount originally due from the defendant and himself, the best evidence of that fact was the oath of the obligee who received the money and who therefore ought to have been produced. His receipts upon the bonds were clearly inadmissible. The fact for which alone the bonds were legitimate evidence, namely, the joint liability of the plaintiff and defendant to the obligee, being admitted, the court ought not to have permitted the bonds themselves to go to the jury, as the effect of doing so was to put them in possession of what had been decided not to be evidence. As sealed instruments, they must, if they are in evidence, be taken out by the jury, and thus not only the bonds themselves, but the receipts endorsed upon them are indirectly made evidence. It is true, as a general rule, that a party may give his evidence according to his own discretion, and cannot be prevented from doing so by an admission of the opposite party. But this rule, like every other, has reasonable limits. When it is evident that the object of the party offering the evidence is to introduce covertly something beyond that for which it purports to be offered, the court will interpose and prevent him from doing indirectly what they had refused him permission to do directly. *Cutbush* v. *Gilbert*, 4 *Serg. & & Rawle*, 551. *Jordan* v. *Wilkins*, 3 *Wash. C. C. R.* 110. *Longenecker* v. *Hyde*, 6 *Binn.* 1. *Lessee of Cluggage* v. *Swan*, 4 *Binn.* 154. *Sluby* v. *Champlin*, 4 *John. R.* 461. 15 *John. R.* 493.

2. To say, in the stage of the cause in which it was said, that the circumstance of the bonds being delivered up, should have its proper weight in the decision of the cause, was erroneous. Nothing had been proved but the bare, unexplained possession of the bonds by the plaintiff. How he came by them, did not appear. The court used the phrase " delivered up," but there was nothing in the evidence to warrant the use of such language. But even if they had been " *delivered up*," that would furnish no right of action against the defendant unless they were delivered up to the plaintiff on his payment of money, on account of the defendant, of which there was not the slightest evidence. They might have been delivered up by the father as a gift to his sons; or *Charles* may have given new bonds in lieu of them, in neither of which cases could *Charles* maintain an action against hi sbrother for contribution. *Morrison* v. *Berke*, 7 *Serg. & Rawle*, 238. *Doebler* v. *Fisher* 14 *Serg. & Rawle*, 180. Or *Thomas* may have previously paid his proportion, and on the balance being paid by *Charles*, the bonds may have been delivered to him. Mere possession then, would prove nothing, and they were consequently irrelevant, except for the purpose of proving a fact which was admitted.

(Craig *v.* Craig.)

If they were not relevant when they were offered, it was no reason for admitting them, that they might afterwards become so by the production of other evidence, *Weidler* v. *The Farmer's Bank of Lanter County*, 11 *Serg. & Rawle*, 134. The issue trying was not whether *Thomas* was liable as a co-obligor, for that was conceded, but whether *Charles* had paid the amount of the bonds to the obligee. In saying therefore, that the possession of them by the plaintiff should have it its proper weight in the decision of the cause, the court, in effect said, that it should have *some* weight in proving the fact of payment; and to say it should have *any* weight was error.

3. The declarations of General *Craig* were not evidence, though *Thomas* was present. What one *party* says in the presence and hearing of the other, is evidence; but not what is said by a stranger, unless the party to be affected by it, expressly admits that it is true. Silence amounts to nothing. The supposed agreement of *Thomas* to be bound by whatever his father should decide, does not vary the question. To give effect to the alleged agreement, two things must be proved: 1st. That *both Thomas*, and *Charles*, agreed to be bound by their father's decision; and 2nd. That their father did decide. The evidence shows clearly, that even if *Thomas* did agree that what his father should say, should decide the controversy, *Charles* never came into any such agreement, and it would be a violation of the plainest dictates of justice, that *Thomas* was bound and *Charles* loose. In all the cases in which the decision of a third person has been held binding, it was by the agreement of both parties. Now, if General *Craig* had said that *Charles* had not paid him, this would not have prevented him from suing *Thomas*, and proving *aliunde*, that he had paid the bonds. If *Boyd's* testimony is to be taken, the general did not decide the question. He was merely silent. Besides, the reference was between the general and *Charles*, to which *Thomas* was not a *party*. There was then no suit pending between the brothers. What was said therefore by *Thomas* was a mere off-hand flourish, not intended to be binding as an agreement. According to *Hyneman's* testimony, *Thomas* said, that if the general would say that he had received the *amount* of the bonds from *Charles*, he, *Thomas*, would pay his share; and this the general never did say.

*Brooke* and *J. M. Porter* for the defendant in error.

1. The action was for contribution between joint debtors, and the plaintiff's first step in the cause was to shew their joint indebtedness. He had proved the execution of the bonds and they were proper evidence, not only to show the joint liability, but to ascertain the amount to be recovered. For these purposes it cannot be denied they were evidence, and if they were evidence for any purpose, they were rightly admitted. *Moore* v. *Houston*, 3 *Serg. & Rawle*, 175. The admission of the fact which the evidence tended to prove, was no reason why it should not go to the jury. The plaintiff had a right to conduct his cause as he pleased, and it could not be taken out of

his hands by an admission on the part of the defendant. It is for the parties according to their own discretion, to produce such evidence as the circumstances of the case may supply. 1 *Stark. Ev.* 398. *Crotzer* v. *Russell*, 9 *Serg. & Rawle*, 81. But the defendant's idea that the bonds were not evidence to show any other fact than the joint liability of the plaintiff and defendant, was incorrect. It is conceded on the part of the defendant in error, that he could not maintain his action without proof of the payment of money for the defendant below; but direct and positive proof of such payment, by one who witnessed it, was not necessary. There is a manifest difference between the subject-matter to be proved, and the character of the proof by which it is to be established. Facts which raise a presumption of payment are sufficient until contradicted, and no stronger evidence can be given to raise such a presumption, than the possession of the bonds by the plaintiff below, which was *prima facie* evidence that he had discharged them. The authorities in support of this position are numerous. *Tuttle* v. *Mayo*, 7 *John.* 133. *Schee* v. *Hassinger*, 2 *Binn.* 331. *Poth. Ev.* 472 (806). *Weidner* v. *Schweigart*, 9 *Serg. & Rawle*, 385. *Zeigler* v. *Gray*, 12 *Serg. & Rawle*, 42. *Rowson* v. *Adams*, 17 *John. R.* 130. *Lonsdale* v. *Brown*, 3 *Wash. C. C. R.* 404. *Sluby* v. *Champlin*, 4 *John. R.* 461.

2. The remark of the court below, that the circumstance of the bonds being delivered up to the plaintiff, should have its proper weight, was a mere incidental observation, which could not affect the propriety of their decision of the point before them, if the evidence was properly received independently of it. But there was nothing objectionable in the remark itself. It was merely that the circumstance referred to should have as much weight as it was entitled to, and no more, to which it is impossible to impute error.

3 and 4. The declarations of General *Craig*, under the circumstances attending them, were clearly evidence. It was not necessary for the plaintiff below to produce him. He had made out a *prima facie* case without his evidence, and if the defendant supposed he could rebut that *prima facie* case by the production of the obligee, it was his business to produce him. A very strong *prima facie* case, to say the least of it, was proved by conversations, in relation to the subject-matter in dispute, at which both parties were present, and in which both participated. The effect of this evidence it was the province of the jury to decide. *Morris's Les.* v. *Vanderen*, 1 *Dall.* 65. *Marshall* v. *Sheridan*, 10 *Serg. & Rawle*, 268. 2 *Stark. Ev.* 37. *Vincent* v. *Huff*, 8 *Serg. & Rawle*, 380, *Sigfried* v. *Levan*, 6 *Serg. & Rawle*, 308. *Craig* v. *Brown*, 1 *Peters*, *C. C. R.* 171. But there is another feature in the case which emphatically makes what passed on the occasion referred to, evidence against *Thomas*. He had distinctly declared, that if his father would say he had received the amount of the bonds from *Charles*, he was ready and willing to pay his share. The plaintiff below proposed to show that his father did say he had received the amount of the bonds from

(Craig *v.* Craig.)

*Charles,* and that the declaration was made in the presence of *Thomas.* It is true, that a party has a right to insist that all the evidence to be adduced against him shall be under the sanction of a judicial oath, but he may wave that right and agree to other and inferior modes of proof; and if he does so, the law will hold him to his agreement. Thus, where a party agrees to be bound by the oath of the opposite party or of a third person, the agreement is obligatory upon him. *Brookes* v. *Bale,* 18 *John. R.* 337. *Delesline* v. *Greenland,* 1 *Bay,* 458. It is true that in these two cases there was an oath, but the oath possessed no greater sanctity than a simple declaration, for it was extra-judicial. These cases go upon the ground, that the party has, by his agreement, waved all other proof. So where a party refers to another for an answer on a particular subject, the answer is in general evidence against him, because he makes the party referred to, his agent for the purpose of giving the answer. 2 *Stark. Ev.* 42, 43. 1 *Camp.* 364. 366. 6 *Esp.* 74. It is no answer to this argument to say, that General *Craig* might have been examined under oath. It was not necessary. The plaintiff gave all the proof which the defendant agreed to be bound by, and that was enough.

The opinion of the court was delivered by

Gibson, C. J.—That the production of the debtor's own bond is evidence of satisfaction, cannot be controverted, because his possession of it is consistent with no other presumption. And it is evidence of satisfaction by the debtor himself, because in the usual course of transactions men pay no debts but their own. All this is strictly predicable of a security payable by but one. But the production of a bond by one of several obligors is no evidence that he has paid the whole, because being incapable of manual possession by all, the custody of it by any one in particular is either accidental or dependant on a variety of circumstances. In some cases it may possibly be committed to the particular obligor who has paid it, as evidence against the rest; but such is not the common course, nor does it, from its frequency, give rise to a presumption. It just as frequently happens that the bond is delivered up, in the absence of the rest who have paid their proportion, to him who extinguishes the debt by payment of the residue; so that no presumption arises more favourable to the one state of things than to the other. If the original joint indebtedness had been disputed, the production of the bond would have been an indispensable part of the plaintiff's case: but as that was admitted, it is impossible not to see that the object of the evidence was to prove that the whole debt had been paid by the plaintiff; to do which the naked fact that he was in possession of the bond, was plainly incompetent.

Error is assigned also in the admission of declarations by the obligee. It is answered that these were competent because they were made, not only in the presence of the defendant, but after he had consented to be bound by whatever the obligee should say. A party

(Craig *v.* Craig.)

is to be affected by the assertion of a third person only on the ground of assent either tacit or express, to the truth of the fact asserted. But where it appears from the offer of the party proposing the evidence the other was entirely ignorant of the state of the fact, much more when he expressly denied its existence, the foundation of its admissibility fails. In such a case the whole is to be rejected. But where the degree of his knowledge or assent is uncertain, the court may undoubtedly refer the decision of the preliminary facts to the jury by putting the whole to them with suitable instructions. The application of this principle to the circumstances of the present case, might be attended with difficulty ; haply we are relieved from it by the legal effect of one of those circumstances, which, on another ground, seems to be decisive. It was testified by two witnesses that the defendant had consented to submit the disputed fact to the dictation of the obligee, whose consequent declarations in the presence of the parties convened with a view to an amicable adjustment, are the subject of this bill of exceptions. A party may undoubtedly assent beforehand to the truth of whatever another shall declare, and though a declaration on the foot of such assent be not conclusive of the fact, it is clearly competent to go to a jury. In particular circumstances the response of a third person to whom the parties had appealed, has even been deemed conclusive. *Starkie Ev.* part IV. 42. The application of this principle to the case before us, is obvious and direct. To one witness the defendant professed an entire willingness to abide by the decision of the obligee; and to another his readiness to contribute his share if the obligee would say the whole had been paid by the plaintiff. After that, can we doubt the competency of the answer thus invoked? As against himself, a party may undoubtedly give to the representation of another, a credit which it would not otherwise have; as was done in *Maclay's Lessee v. Work*, 10 *Serg. & Rawle*, 194. It is no objection here, that the obligee might have been called to testify under the sanction of an oath. By adopting his answer beforehand, the defendant had made it his own; and though it was open to proof of *mala fides* or mistake, it lay on him to furnish the evidence necessary to the purposes of contradiction or explanation. It was the business of him, therefore, and not of the plaintiff to produce the obligee. In an action not founded on a special promise to pay whatever a third person shall pronounce to be due, I am unprepared to say the representation of such third person is conclusive ; but as evidence of the fact in dispute, it is undoubtedly competent to go to the jury. The naked fact of possession of the bond was however, improperly admitted: and the judgment is reversed on that ground.

Huston, J.—If two are jointly indebted by bond, and one pays all, he may have assumpsit against the other for his proportion—this generally—but if two sons are bound to their father in a bond payable at a distant period, and that bond is expressly payable to the

(Craig *v.* Craig.)

father only, and to no other person, and one of the sons pays this bond several years before it becomes due, it is not so clear that he can in all cases and in all events recover from his brother—evidently the bond in question was not intended to be enforced unless by the father. 1 would say, if he did not collect it, or at least sue on it, no one else could.

The declarations of the father, in my opinion, were not evidence, because, although *Thomas* said he would submit to be governed by what his father said, yet *Charles* never agreed to be so bound; and because the father never was told that the sons had agreed to submit their dispute to his statement of facts. If it is possible that any suit shall be settled in such way, it must be where both agree to be bound; and where the person whose statement is to decide the matter, is apprised of the agreement, and of the importance attached to his statement. It never can be that expressions used in a casual conversation, or in a dispute with a third person, or one of the parties, can come within the meaning of the agreement. I do not much like the cases cited on this subject; to make them at all consistent with reason, the person whose words are to settle a suit should be apprised of the necessity of stating the truth, the whole truth and nothing but the truth, exactly as if giving testimony on oath.

The declarations of the father that he had received satisfaction, are according to our decisions, evidence against the father, or those claiming under him, because against the father's interest; but the declarations of the father many years after the bonds were given up as to who paid them, are not evidence; they are not within the reason of the rule; it does not affect the father's interest whether they were paid by one son or the other; he has no more interest in a contest between his sons than a stranger would have, who stood by and saw the money paid; and in my opinion, his declarations are no more evidence, than would be those of such stranger.

Judgment reversed and a *venire facias de novo* awarded.