# John Eager Howard and Elizabeth Jernyng-ham vs. William H. Carpenter.

An agreement between A and B, in which the former agrees to give the latter a lease, for ninety-nine years, of certain land for a stipulated rent, as soon as he shall comply with certain conditions *manifestly prepared* and intended to be executed by *both*, but signed by A *alone*, with the day of the month *left blank*, and never signed or attempted to be signed by B, and never *delivered* to him during A's life, is an *inchoate* instrument, passing to B no interest, either *legal* or *equitable*.

An order directing possession of land to be delivered to a party *"to whom it has been leased for ninety-nine years,"* is not itself a lease, nor an agreement for a lease, for that term which equity can enforce, being defective, if for no other reason, in not showing *what rent is to be paid*

Possession of land taken in *May,* in pursuance of such an order, cannot be regarded as showing that the party's *subsequent* holding was under a contract made in the *following July.*

The fact that in a *partition case,* certain land held by the defendant and others as tenants in common, under a title not derived through that case, was allotted to the defendant and described as *"in the tenancy of C,* for the term of ninety-nine years,"* does not *estop* the defendant from relying upon defects in C's title, *he not being a party to the case,* and claiming under an instrument defective on its face as a lease for that term.

Such a description, though an admission that the property was in the tenancy of C, is not such an *acquiescence* in a contract for leasing it to him made by the ancestor from the land descended, as would amount to a ratification or confirmation by the parties to the partition case, of such contract.

To give to an admission the effect of ratifying or confirming a contract, it is necessary for the party relying upon such admission to show that the party making it, did so with full knowledge of all the facts affecting his rights.

An attorney, either at law or in fact, has no authority to make a *lease* or confirm an imperfect one, or to perfect an inchoate agreement for a lease of property of his principal or client, unless authority for such purpose is *expressly* given.

Though a court of equity will, in many instances, aid a *defective execution* of a *power,* it will never interpose in the case of a *non-execution* of a *power.*

Courts of equity will grant relief as against remainder-men, to lessees claiming under a defective execution of a power to lease, made by life-tenants, in cases depending upon equitable circumstances.

Appeal from the Circuit Court for Baltimore city.

The bill in this case, filed on the 7th of September 1852, by the appellee, against the appellants, alleges that in 1846,

Carpenter entered into a written contract of lease with Mrs. Caton, under her signature, to lease of her a tract of land, near Catonsville, containing about ninety acres, particularly described in said contract, now in possession of Charles Z. Lucas, the agent and solicitor of the defendants, and that under this contract he entered into and remains in peaceable possession of the premises; that a few months subsequent to the making of this contract, Mrs. Caton died, leaving a will, under which the premises in question became the property of her daughter, Elizabeth Jernyngham, known as Lady Stafford, and that the legal title thereto is, by virtue of certain chancery proceedings, vested in the defendant, Howard, as her trustee; that said contract for lease stipulates for payment of annual rent, and for the erection, prior to executing a lease thereof, of a building on the premises, sufficient to secure the rent, but that Mrs. Caton died before any rent accrued, and Carpenter was unable to ascertain to whom it was payable, no rent having been demanded of him by any one having or pretending authority from the owners to receive the same; that he believes Josias Pennington was the agent of Lady Stafford and other heirs of Mrs. Caton, representing them under a deed of trust, and assented to the non-payment of the rent until the title to the property should be made to Carpenter, or the affairs of Mrs. Caton arranged, and some assurance given that her said contract would be carried out and fulfilled, according to its purport and intent. He further alleges, as a reason for the non-payment of the rent, and not erecting the building aforesaid, that the contract, under which he took the premises, became lost or mislaid by Mrs. Caton, or her agents, and could not be found for a long period after her death, and that this contract was the only evidence and proof he had of the fact of such agreement of lease having been made, and the terms thereof, and he was fearful, and had reason to suspect, that her representatives would not comply with its terms. He then avers that, in violation of this contract, without making any demand on him for the rent, Lady Stafford has fraudulently, and against equity, procured her trustee, Howard, to institute an action of ejectment, which is now pending against him, and

Howard, *et al.*, *vs.* Carpenter.

seeks to turn him out of possession of the premises, and make the contract of no effect; that for a long period he has been seeking to get a lease of the premises, or some assurance that a lease would be made to him on payment of such rent as might be found due, and the erection of a building as aforesaid; that he is informed, and believes, that by law he cannot be made, and ought not, to pay rent for a period when, by reason of the cloud upon his title, and the great uncertainty of his getting a title thereto, the land was wholly useless and unprofitable to him; that he is willing to bring into court such amount of rent as it may decide to be due, or pay the same to Howard or Lady Stafford, as the court may direct, and that he would at any time have paid the rent, if he had, or could have, obtained any assurance that his contract would be respected, and the lease made to him accordingly. He avers his readiness and willingness to erect the building contemplated by the contract, whenever it shall be ascertained that a lease will be made to him, but that Lady Stafford and her trustee have refused to acknowledge the contract, and have declared to him that under no circumstances will they make the lease, as provided for in said contract, and under these circumstances, and particularly when it is considered that the contract of Mrs. Caton was not in his possession, but beyond his reach and control, he alleges, as matter of law, that he was not bound to seek out the party entitled to the rent, and make a tender thereof, when it was very uncertain to whom the rent was payable, until a division of the property should take place; and to sustain his assertion of the difficulty of his position, he avers that the trustee in whom the property was intended to be vested, refused to accept the trust, and no trustee was in existence, competent in law to act in the premises, until within a short period, when the appointment of Howard was made by the court of chancery, as above stated. The bill then prays for an injunction to restrain Howard from further prosecuting the ejectment suit, that the defendants may be required to file the contract with their answer, if in their possession, or under their control, and be commanded to make the lease aforesaid to the complainant, on such terms as the court may deem just and proper, and for general relief.

The injunction was issued, an interlocutory decree taken against the defendants, who appeared, but failed to answer, and an *ex parte* commission issued, under which certain exhibits were filed and proved, including a *memorandum* of the material parts of the contract referred to in the bill, taken by *Benj. C. Barroll, Esq.*, who was also examined as a witness and testified that he knew the property in question, and had knowledge of the contract referred to in the bill, having read the same furnished to him by Charles Z. Lucas, solicitor for the defendants, and loaned to witness as the contract between the parties, and the *memorandum* above mentioned, is a copy made by witness from the original, of its material contents, omitting the description of the land, and that he returned the original to Lucas; that Carpenter took possession of the property under the contract, and still continues in possession; that witness was Carpenter's counsel after Mrs. Caton's death, and had several interviews with Pennington, who was then acting as agent and attorney for her heirs, in relation to this lease, in which Pennington told him he was aware of the existence of Carpenter's contract, had seen it, and that it should be respected, he, however, said he could not then find it, that it came into his possession from James H. Stimpson, the agent of Mrs. Caton up to the period of her death; witness told Pennington that if he would receive the rent, Carpenter would pay it to him, but Pennington declined, saying he had prepared a deed creating himself trustee, which he was about to send over to England, to be executed by Lady Stafford and her sisters, and when that was done, it would be time enough to pay the rent and get the lease; that Pennington subsequently told witness that they refused to execute the deed to him, and his agency and attorneyship ceased; witness further stated to Pennington that Carpenter could not put up the house, or carry out his part of the agreement, in the then unsettled state of the title to the property, the contract being lost, and Carpenter having no copy of it, and it being uncertain whether the parties to whom the land might be distributed, would carry out Mrs. Caton's agreement; that after the refusal of the parties to execute the deed of trust to Pennington, Mr. Lucas be-

came the solicitor of Lady Stafford, and witness applied to him, and to Howard also, when the latter was made trustee, on Carpenter's behalf, to have the contract carried out, but both positively refused to do so, and brought the ejectment in the name of Howard.   In demanding from Howard and Lucas the execution of the contract, witness expressly inquired of them both whether the lease would be executed if Carpenter would put up the house and pay the arrears of rent, with interest, and they explicitly responded in the negative.   Witness never saw the original contract until shown him by Lucas, in whose custody it was, and to whom he returned it.   Mrs. Caton died within about six months after the date and execution of the contract.   If witness could have obtained from Pennington, or Lucas, or Howard, or any one representing Lady Stafford, any assurance that she would respect her mother's contract, or, indeed, if witness could have obtained the original contract, Carpenter could have disposed of his interest for a very considerable profit; several parties were anxious to buy his interest, and were willing to pay him a considerable advance, but the negotiations were frustrated by the circumstances to which witness has referred, and, in consequence of this difficulty about the title, the property has remained idle for four or five years.   Lady Stafford is a resident of England, acting in this country only through her agents.

Afterwards, upon affidavit of their solicitor, that their neglect to answer was caused by a misunderstanding between the solicitors on both sides, the answers of the defendants were permitted to be filed.   The answer of Howard, which that of Lady Stafford refers to and adopts, denies that Carpenter entered into a written contract of lease with Mrs. Caton, as alleged in the bill, but admits that she had been in treaty with him for the leasing of the land, and did sign a paper which was intended to have been signed also by Carpenter, if the agreement had been consummated, but that it never was executed by Carpenter, and never was delivered to him, but was retained by her till her death; after her death, Carpenter having claimed the execution of this alleged agreement for a lease, his counsel, Mr. Barroll, applied to respondent's counsel, Mr.

Lucas, to be allowed to see the paper, when it seems he took the very imperfect memorandum of it filed in the cause, but respondent denies it was ever admitted to be, or shown to Mr. Barroll as, a completed and valid agreement between Mrs. Caton and Carpenter, and he herewith files the paper marked "*Exhibit A.*" He admits the land is the property of Lady Stafford, and that the legal title is in respondent, as her trustee, but denies expressly that Mrs. Caton had, during her life, any right or authority to bind Lady Stafford, by any such contract as this paper is alleged to be, to execute a ‘lease for the property, Mrs. Caton being but a *cestui que trust* for life of the same, with power to direct conveyances or leases only according to the terms prescribed in the will and codicils of her father, Charles Carroll of Carrollton. He admits that Carpenter has taken possession of the land, but insists that he is there without good title or lawful authority, and respondent has accordingly brought an ejectment to dispossess him. He further says, that if this paper was valid to bind Mrs. Caton, it is not valid to bind Carpenter, never having been executed by, or delivered to, him, and thus wants the mutuality of obligation which ought to constitute the consideration of it; that Carpenter has never acted under it, by the performance of such acts as are therein stated, to be conditions precedent to his right to ask for a lease, and the time has long since elapsed within which such conditions were to be performed, and he denies that Pennington was at any time Lady Stafford's agent, with authority, by his acts or declarations, to bind her in relation to this property, or that he ever did or designed to do so.

It was *admitted* that, with other, the property in dispute was conveyed by Charles Carroll of Carrollton to Richard Caton, in fee, and by him afterwards mortgaged to Robert Oliver, and afterwards, by deed dated the 12th of January 1838, (reciting the death of Oliver, and appointment of his executors, and also the appointment of McTavish and Stewart, by the will of Charles Carroll, as trustee of Mrs. Caton, and also the power of Mrs. Caton to direct the sale of her property and the purchase of other,) the executors of Oliver, Richard Caton and

Mrs. Caton, conveyed this property to said McTavish and Stewart, in trust, "to and for the uses and trusts specified and declared of and concerning the property bequeathed to them in trust as aforesaid, for the use and benefit of said Mrs. Mary Caton, in and by the said last will and testament of Charles Carroll of Carrollton, and the codicils thereto," the consideration of this deed being, that Mrs. Caton had sold other property and paid off the said mortgage; that McTavish and Stewart, in December 1844, conveyed it to Pennington and Hoffman, who had been appointed, by a decree in chancery, trustees in their place, upon the same trusts as they had held it. It was further admitted, that by the will of her said father, Mrs. Caton had power to direct, from time to time, during her life, any sales, conveyances, leases, transfers and assignments of the property, or any part thereof, bequeathed to trustees for her benefit. It was also admitted, that James H. Stimpson was authorized by Mrs. Caton, in her life time, by her power of attorney, duly executed and delivered, to make and enter into agreements for leases of the property of Mrs. Caton, subject to her ratification, and that the *order* herewith filed, marked A, directing the surrender of the property in question to Carpenter, was signed by Stimpson and delivered to Carpenter at the date thereof, who received immediate possession in pursuance of it. It was also admitted, that Mrs. Caton died in or about October 1846.

The will of Charles Carroll contains *three clauses* devising property in trust for his daughter, Mrs. Caton, which are particularly referred to in this case, for the purpose of ascertaining the nature and extent of her authority or right to dispose of the property in dispute, and are as follows:

The *first* directs the property to be held during the lives of Mrs. Caton and her husband, and the life of the survivor of them, "upon the following trusts, that is to say, in trust for my daughter, Mary Caton, during her natural life, for her sole and separate use, free from the control or power of her present or any future husband, and to permit her, or any person she may authorize, to receive and take, during her life, the rents, profits and issues thereof, for her sole and separate use, and to

34    v. 11.

make and execute, during her life, all such sales, conveyances, leases, transfers and assignments thereof, or any part thereof, as she, by writing under her hand, shall from time to time direct; and the proceeds of all such sales, conveyances, leases, transfers and assignments, from time to time to invest in such purchases of stock, funds, rents, or property of any kind, as she, by writing under her hand, may from time to time direct, to be held by them in their names, in trust for her sole and separate use, as aforesaid, during her life." And in case her husband, Richard Caton, should survive her, then the property, including re-investments, are directed to be held in trust for the use and benefit of the said Richard Caton, during his life, with powers like those previously given to Mrs. Caton. Then the will thus proceeds: "And from and after the death of the said Richard Caton and Mary Caton, I give, devise and bequeath all the said lots, houses, rents, slaves, plate and furniture, and also all property of every kind accruing from the sale, transfer, conveyance, lease, assignment and re-investments aforesaid, unto my grand-daughters, Mary Ann Patterson, Elizabeth Caton, Louisa Catharine Harvey, and Emily MacTavish, their heirs, executors and administrators, as tenants in common, equally to be divided between them."

The provisions contained in the *second* clause are: "In trust for my daughter, Mary Caton, her heirs and assigns, for her sole and separate use, free from the control and power of her present or any future husband, with power to my said daughter, Mary Caton, to sell, give, convey, or otherwise dispose of the said lands, lots and houses, or any of them, or any part thereof, by deed or last will and testament, or in any other mode in which she may think proper, in the same manner as if she were a *feme sole.*"

The *third* clause gives one-third of the residuum of the testator's estate in trust for Mrs. Caton, during her life, for her sole and separate use, free from the control or power of her husband, and to permit her, or any person she might authorize, to receive and take, during her life, the rents, profits, interest, income and dividends thereof, for her sole and separate use, with power for her to make sales, conveyances, leases,

transfers and assignments, and the proceeds of the same to invest in like manner as provided for in the first clause. And upon the death of Mrs. Caton, the will gives "the said one-third of the general residuum aforesaid" unto the testator's four grand-daughters, named in the first clause, forever, as tenants in common.

The other admissions and 'facts in the case, including the defendant's *Exhibit A*, and the *Order A*, referred to in these admissions, are fully stated in the opinion of this court.

Exceptions were filed by the defendants to so much of the testimony of Barroll as professes to state the conversations held by him with Pennington, Lucas, and Howard, and also to the "Order A," as evidence of any other contract or lease than that set out in the bill, or as evidence pertinent to the allegations in the bill and the contract there alleged and relied upon.

The court (Krebs, J.,) passed a decree making the injunction perpetual, and directing the defendant, Howard, to execute a lease to Carpenter, according to the terms of the contract. From this decree the defendants appealed.

The cause was argued before Le Grand, C. J., Eccleston, Tuck and Bartol, J.

*George W. Dobbin* and *Thomas S. Alexander*, for the appellants, argued:

1st. That no contract for a lease or of a lease, is proved in the cause. The paper relied on by the appellee cannot operate as a *present demise*, because, being for estate over *seven years*, it was not executed and *recorded* according to the provisions of the acts of 1715, ch. 47, sec. 8, and 1766, ch. 14, sec. 2. Neither can it operate as an *executory agreement*. There was no *delivery* of this paper: it was never, and is not alleged ever to have been, in Carpenter's possession. It was never executed by Carpenter; its date was left blank: it was kept in Mrs. Caton's possession *till her death*, and she never intended to be bound by it, till it was executed by Carpenter. Such an *inchoate, incomplete, unexecuted* contract, can have

no validity whatever.  *Powell on Contracts,* 287.  *2 Peere Wms.,* 65, *Ayliffe vs. Tracy.*  There were no acts of *part performance* of it.  Carpenter went into possession of the property *in pursuance* of the *order* from *Stimpson,* two months *anterior* to the date of this alleged contract, and the possession was under this *order,* and not under this contract.  There is no proof that Mrs. Caton knew that he had taken possession, nor of the particulars of the agreement between him and Stimpson.  This *order* of Stimpson cannot be construed into a direction to the trustee to make the lease, nor as a lease, nor an agreement for a lease.

2nd.  That conceding a contract for a lease to have been made, it was not perfected during the life of Mrs. Caton, and by the terms of the will of her father it would not be perfected after her death.  The *first* and *third* clauses of this will give her but a life estate, with a *power* to direct leases and sales, and the recitals of the deed creating her title to this particular property, show that it has reference to these clauses of the will.  The *second clause* gives her a fee-simple, but there is nothing to connect this clause with the property in dispute.  That such an agreement as this, attempted to be made by the life-tenant, cannot be enforced against the remainder-man, is clear from the authorities.  3 *Merivale,* 235, *Blore vs. Sutton.*  6 *Madd.,* 207, *Symons vs. Symons.*  1 *Sugden on Powers,* 174.  But again, by these clauses of the will, the power to direct leases does not attach to property purchased from the proceeds of sale of other property, but only to the original estate, and such a power cannot be raised by implication, (1 *Platt on Leases,* 394, 398,) and, by the *admissions* in this case, it may fairly be inferred, that the property in question was so purchased: if this is so there is an end of the case, for in that case the trustees must hold it for her own separate use, and she had no power whatever to lease it.

3rd.  That the consideration binding Mrs. Caton to give a lease being the covenants on Carpenter's part, as they were never entered into by Carpenter, the contract never was complete.  The contract to be enforced must be mutually binding, and *both parties* have the right to ask for its specific execution.

2 *Jac. & Walk.*, 428, *Martin vs. Mitchell.* 1 *Sch. & Lef.*, 20, *Lawrenson vs. Butler.* 14 *Johns.*, 489, *Clason vs. Bailey.* 21 *Penn. State Rep.*, 50, *Bodine vs. Gladding.* The evidence shows no excuse, whatever, for Carpenter's failure to perform his part of the alleged agreement. There is no evidence that the appellants prevented the erection of the house, or that Carpenter ever contemplated its erection. A cloud upon the title is no reason why he should not do it.

4th. That if the paper relied upon had been perfected by Carpenter's signature, and had been delivered to him, and if free from the objection, that Mrs. Caton had no power to make it in the form in which it is, still, as it contains no words of *present demise,* and is but *"articles of agreement"* by which she is to *give a lease* when the house is built, it would only be a *contract for a lease* and not a *lease itself,* and therefore vested no estate in Carpenter; and though equity will in some cases relieve against a forfeiture of a *vested* estate, it will *never* relieve against a forfeiture, *in order to vest* an estate, and as Carpenter could by the terms of the paper claim no estate till he had performed the condition precedent, equity will not aid him. *Act of* 1766, *ch.* 14. *Arch. Law of Land. & Tenant,* 57, in 53 *Law Lib.*, 76. 3 *Taunt.*, 65, *Morgan vs. Bissell.* 3 *G. & J.*, 281, *City Bank vs. Smith.* 3 *Gill* 269, *Cross vs. Cohen.* 5 *Md. Rep.*, 531, *Collins vs. Carman.* 1 *Vernon*, 83, *Popham vs. Bampfield.* 2 *Vernon*, 339, *Carey vs. Bertie.* 1 *Fonb. Eq.*, *B.* 1, *ch.* 6, *sec.* 5. *Platt on Cov.*, 302, 303. 16 *Ves.*, 402, *Hill vs. Barclay,* and *same case* in 18 *Ves.*, 56. 10 *Ves.*, 66, *Wadman vs. Calcraft.* 2 *Merivale,* 459, *White vs. Warner.* 10 *Eng. Law & Eq. Rep.*, 134, *Gregory vs. Wilson.* 2 *Price*, 200, *Bracebridge vs. Buckley.* *Ibid.*, 206, *Rolfe vs. Harris.* 2 *Story's Eq.*, *sec.* 776. 12 *Ves.*, 282, *Sanders vs. Rope,* (and *note a.*) 1 *Sug. on Vend.*, 359, 360. 1 *Ball & Beatt.*, 285, *M'Alpine vs. Swift.* 7 *Md. Rep.*, 323, *Mills vs. Matthews.*

5th. That if, at any time, Carpenter could have invoked the aid of equity, to enforce the specific performance of his supposed agreement with Mrs. Caton, he has lost the right to do so, not only by his failure to make the erection provided for

therein, but also by his delay in instituting proceedings to enforce it, the paper, which is supposed to evidence the agreement, being dated in July 1846, and the bill being filed in September 1852, and even then not as an original proceeding to compel performance of the agreement, but to obtain an injunction to restrain Lady Stafford, from recovering possession of the property by an ejectment. Thus leaving an interval of nearly six years, during which he has neither paid nor tendered his rent to any one authorised to receive it, nor erected, nor prepared to erect, the proposed building, nor bound himself, nor offered to bind himself in any manner to the observance of the supposed agreement. 2 *Story's Eq.*, sec. 771, and cases there cited. 3 *Johns., Cases,* 60, *Ballard vs. Walker.* 1 *Russell & Mylne,* 506, *Davis vs. Thomas.*

*F. K. Howard* and *S. T. Wallis*, for the appellee, argued:

1st. That the contract between Carpenter and Mrs. Caton was not a mere executory agreement for a future lease, but created a subsisting term, and was in fact a lease *in presenti*. It was clearly defined in its terms, and partly executed by both parties; and the lease therein contemplated to be given at a future day, was only a more perfect and formal assurance for Carpenter's benefit. It is recognised as a subsisting lease, in the proceedings under which Lady Stafford took her title to these premises. 4 *Greenlf's Cruise,* 58. *Chitty on Cont.,* 313, 314, 315. 4 *Kent,* 105. *Taylor's Land. & Ten.,* sec. 43. 12 *East.,* 168, *Poole vs. Bentley.* 21 *Eng. C. L. Rep.,* 318, *Hancock vs. Caffryn.* 33 *Do.,* 317, *Chapman vs. Bluck.* 46 *Do.,* 171, *Curling vs. Mills.* 10 *Johns.,* 336, *Jackson vs. Kisselbrack.* 1 *Md. Rep.,* 236, *George's Creek Co., vs. Detmold.*

2nd. That Mrs. Caton had full power to execute the instrument under which Carpenter claims title, whether it be regarded as a lease or only an agreement for a lease. By the deed of trust under which her title arose, she had all the powers in reference to this property, which she enjoyed in regard to any of the property given to her by her father's will, and as to the property thereby specifically devised to trustees for

her benefit, she had the right of absolute disposition. Powers will be construed *liberally* to advance rights. 5 *Md. Rep.*, 91, *Pearce vs. Van Lear.* It is contended, on the other side, that the power to Mrs. Caton to make leases, is limited to the *original property* which she took in trust under the will of her father, and does not extend to such as was acquired by the proceeds of the original property that might be sold. But, in the first place, there is no evidence to show that this property was purchased by the proceeds of the original property; and, in the second place, the will makes no distinction between the property which he gave originally to the trustees to hold for Mrs. Caton, and that which might be purchased from the proceeds of the sale of such estate; the latter is to be held under the same trusts as the original property.

3rd. That supposing Mrs. Caton to have been merely a tenant for life, with power to lease the property in question, the instrument referred to was binding on the parties in remainder, even although it would be construed to be simply an agreement for a lease. This position is clearly sustained by the case of *Shannon vs. Bradstreet*, 1 *Sch. & Lef.*, 52. See also 2 *Ball & Beatt.*, 529, *Lowe vs. Swift*. 1 *H. & McH.*, 163, *Carroll vs Llewellin.* 1 *Sug. on Vend.*, 174. 1 *Platt on Leases*, 394.

4th. That the operative force of the instrument in question can be affected in only two ways, by the fact that it was not signed by Carpenter, viz., 1st. As evidence that it was an inchoate, and intentionally incomplete contract. 2nd. As depriving it of the necessary mutuality supposing it to be a complete one. That it was not inchoate and incomplete, is proven by the fact that Carpenter was placed in possession with a view to it and under it, and that in the very proceedings which gave to Lady Stafford her title to this tract in severalty, it is specially described as subject to this *identical lease* to Carpenter. The absence of Carpenter's signature, is of no avail here on the subject of mutuality, the statute of frauds only requiring the signature of the party who is to be bound, and Carpenter having besides been placed in possession, and having rendered himself liable not only to proceedings to compel spe-

cific performance, but also to a suit at law upon the covenants and provisions of the instrument. 1 *Platt on Leases*, 570. 2 *Do.*, 5, 6, 15. 42 *Eng. C. L. Rep.*, 817, *Cooch vs. Goodman.* 12 *Do.*, 327, *Barnett vs. Lynch.* *Taylor's Land. & Ten.*, 665. *Co. Litt.*, 231 *a.*, 231 *b.* 3 *Md. Rep.*, 68, *Stewart vs. Redditt.*

5th. That the engagement on the part of Carpenter, to build a house, was not a condition precedent the performance of which was necessary to entitle him to a lease; nor was it in any point of view, such a condition as caused a forfeiture of his lease for its non-performance, such stipulation being merely a covenant. 8 *Barn. & Cres.*, 308, *Henniker vs. Watt. Longfield & Townshend*, 232, *Sharpe vs. Bergin.* 5 *G. & J.*, 253 to 256, *Watchman & Bratt vs. Crook.* *Taylor's Land. & Ten.*, 643, 665.

6th. That even if the stipulation to build could be construed to be a condition precedent, the breach of which forfeited the lease, equity would relieve against such forfeiture; even if Carpenter had no other grounds on which to ask relief, than that the breach was not wilful and compensation in damages could be made, and that the condition was solely to secure a collateral engagement. But where the performance of the condition, as in this case, was prevented solely by the wrongful act, or neglect or default of the appellants, or without fault of the appellee, the right to relief is clear. And this doctrine is equally true, whether the instrument under which Carpenter claims be regarded as a lease or an agreement for a lease. 2 *Story's Eq.*, *secs.* 771, 775, 776, 1315, 1316 *note* 1323. *Arch. Land. & Ten.*, 332. 2 *Platt on Leases*, 490. *Willard's Eq.*, 534. 1 *Smith's Lead. Cases*, 95. 2 *Greenleaf's Cruise*, ch. 2, *sec.* 29. 2 *Sch. & Lef.*, 682, *Lemmon vs. Napper.* 3 *Ves.*, 690, *Eaton vs. Lyon.* 1 *Ball. & Beatt.*, 286, *M'Alpine vs. Swift.* *Beatty*, 352, *Firman vs. Lord Ormonde.* 2 *Price*, 200, *Bracebridge vs. Buckley.* 3 *G. & J.*, 265, 281, *City Bank vs. Smith.* 2 *Johns.*, *Ch. Rep.*, 535, *Skinner vs. Dayton.*

7th. That Carpenter was in no default whatever. Mrs.

Caton died almost immediately after the execution of the lease. It remained in her possession, and Carpenter could not get possession of it, or obtain a copy of it. Pennington was not then one of the trustees in whom the legal title was vested. Carpenter's counsel called in his name on Pennington, offering to do all that his lease required. He could call on no one else. The property was undivided:—Lady Stafford in England. Pennington would not receive the rent, or give any guarantee on which Carpenter could proceed to perform his part of the agreement. He called on Howard when he became trustee and on Lucas, Howard's counsel. Both of them rejected his pretensions, and denied the validity of his lease. It is insisted, that the declarations of all these parties are competent evidence, not merely as declarations but as facts, and that Carpenter was justified by them in his course in the matter. It is further contended, that Lady Stafford is *estopped* from complaining of a course which was produced by the acts and declarations of parties who had a right to represent her, and that she is especially *estopped* from denying that Carpenter is a lessee under the agreement in question, he being described as such in the very proceedings under which she claims, and she having taken the property subject, in terms, to his lease, and valued accordingly.

ECCLESTON, J., delivered the opinion of this court.

The will of Charles Carroll of Carrollton, contains *three* clauses, devising property in trust for his daughter Mrs. Caton; to which clauses particular reference has been made, in argument, for the purpose of ascertaining the nature and extent of her authority or right to dispose of, or to lease the property in dispute. The deed creating her title, conveyed the property to the trustees therein named, "in trust for the uses and trusts specified and declared of and concerning the property bequeathed to them in trust for the use and benefit of Mrs. Caton," by her father's will.

The appellants contend, that in view of the recitals in the deed, in connection with the provisions contained in the *first* and *third* clauses of the will referred to, the deed must be re-

35     v. 11,

garded as having reference to them; and therefore Mrs. Caton had only a life estate, with a *power* to lease or sell.

The appellee insists, that the deed should be construed as being governed by the *second* clause of the will, which, instead of simply giving her a *power* to dispose of the property devised, conferred upon her the unlimited and absolute right of disposition.

Our view of the case renders it unnecessary to decide which is the proper construction of the deed.

The defendants' exhibit A, is the instrument on which the complainant chiefly relies in support of his bill, and is as follows:

"*Maryland, St:*—Articles of agreement, entered into this —— day of July 1846, between Mary Caton of the city of Baltimore, on the one part, and W. H. Carpenter of Baltimore county, on the other part; witnesseth, that for and in consideration of the covenants herein stipulated, on the part of W. H. Carpenter, the said Mary Caton doth engage to grant a lease to the said W. H. Carpenter, for a period hereafter stated, for all that part or parcel of land," &c. And after describing the premises, the instrument thus proceeds: "and the said Mary Caton, engages to give a lease for the foregoing premises, as soon as a house shall be built, of the value of the annual rent and all other conditions be complied with, for the term of ninety-nine years. And the said W. H. Carpenter, engages to pay to the said Mary Caton for the first year, one dollar and five cents per acre, annually, from the first day of January 1847, in half yearly payments, as a rent for the said premises, clear of all deductions for taxes, levies, contributions or otherwise, for the next nineteen years, from the 1st January 1848, two dollars and ten cents per acre, per year, in semi-annual payments as aforesaid, clear of all deductions as aforesaid, and thereafter two dollars and fifty cents, per acre, per year, with the privilege of buying out at $41.66, forty-one dollars and sixty-six cents per acre. That he will within three years build a house on the premises of stone, or brick, or wood, worth an annual rent equal to the rent of the premises. For the full performance of each and every article of the above

contract, the said Mary Caton and the said W. H. Carpenter, bind themselves, their heirs, executors, administrators and assigns, by these presents.    In witness whereof, the parties have hereunto set their hands and seals respectively, this —— day of July 1846.

her
MARY ✕ CATON,    (Seal.)
mark.

(Seal.)

Signed, sealed and delivered in the presence
of, the same having been first read to Mrs.
Caton.—*M. C. Jackson.*"

We need not inquire whether this instrument, according to the English decisions, should be construed to be a lease, or an agreement for a lease; for if, irrespective of our registration laws, its language would make it a lease, then being for more than seven years, and not having been acknowledged and recorded, as required by those laws, it could pass no title at law. And if, under its very defective execution, it could have any effect in a proceeding in equity like the present, it could only be the effect which should be given to an agreement for a lease.

In *Anderson vs. Critcher*, 11 *G. & J.*, 450, the appellee sued the appellant in an action of covenant to recover rent, under a contract signed and sealed by both parties, dated the 24th of April 1833, in which it is said, Critcher "binds himself, his heirs, &c., to give a lease for ten years," &c.    The contract provides, "that the house which the said Donohoo and Anderson may put up for their own convenience, they can take down and carry off at any time, but they must give said Critcher or his assigns, notice of the intention to give up the property on or before the month of June, (otherwise it will be theirs for another year.)    The said Donohoo and Anderson, bind themselves, their heirs, &c., to pay to the said Critcher, one hundred and fifty dollars, for the rent of one thousand eight hundred and thirty-four, and two hundred dollars per year after, the rent to be paid (or carry interest) after the expiration of the fishing season."    The court did not deem it necessary to determine, whether the agreement was a lease or a mere agreement for a lease.    They however concurred

with the appellant, in construing the instrument of writing on which the action was founded, to be for the term of ten years, determinable within the term, at the will of the appellant, upon his giving notice to the appellee, on or before the month of June, otherwise the term would continue for another year, And considering the property to lie in Maryland, the court say: "the agreement not being acknowledged and recorded, agreeably to the registration laws of the *State*, it passed at law no title whatever in the demised premises to the appellant, and consequently the covenant for the payment of rent which is dependent on the appellant's title, or interest in the demised premises created by the agreement, is wholly inoperative and void; and no such action of covenant can be maintained thereon, whether regarded as a lease or a covenant for a lease. If the appellant has, under color of this agreement, occupied the property intended to be demised, the appellee's remedy for the rent is not in covenant; but if the occupation be without his assent, it is *trespass quare clausum fregit;* if with consent, an action for use and occupation, or an *assumpsit* upon an agreement, from year to year of similar import with that ineffectually executed, and which the law implies as existing between the parties." See also *Peter vs. Schley*, 3 *H. & J.,* 216. *Mayhew vs. Hardesty*, 8 *Md. Rep.*, 495.

Whether the deed to the trustees, for the use and benefit of Mrs. Caton, is to be regarded as having reference to the *second* clause of her father's will, or to the first and third clauses; and consequently, whether she had a life estate with a *power* to lease, or had the "right of absolute disposition" of the property, in our opinion the appellee is not entitled to the relief he seeks.

We think the alleged contract was an inchoate instrument, which never passed any interest or title, legal or equitable to Carpenter. It was manifestly prepared for the purpose of being executed by both parties. Mrs. Caton, alone, signed it, leaving the day of the month blank; the presumption from which may justly arise, that the blank was to be filled up when the paper should be executed by Carpenter. There is no proof, whatever, that he ever called for the purpose of sign-

ing the paper, or that he made the slightest effort to sign it. There is an entire absence of any evidence, that the instrument was, during Mrs. Caton's life, ever delivered to Carpenter or to any one for him; or that she did any act justifying even an inference, that she intended it should be delivered, or considered as a binding contract, (unless her simple signature can be construed as evidence of such an intention,) whilst the paper was still remaining in her own possession. And we do not suppose that such an effect can be ascribed to the mere signature. The proof does not show, satisfactorily, that the instrument ever left the possession of Mrs. Caton during her life. Admitting it was received by Mr. Pennington from J. H. Stimpson, it does not appear when it was so received, or when Stimpson became possessed of it. The parties admit, that Stimpson was authorised by Mrs. Caton, by her power of attorney, to make and enter into agreements for leases of her property, subject to her ratification. If, therefore, it should be supposed, that after Mrs. Caton had signed the contract it went into the hands of Stimpson during her life, the reasonable presumption is, he had it as her agent, for the purpose of its being signed by Carpenter, and not for the purpose of making it a valid contract without his signature.

The appellee relies upon his possession of the property as a circumstance in support of his alleged contract with Mrs. Caton. On this point his witness, Mr. Barroll, says, "Mr. Carpenter, the complainant, took possession under the contract, and still continues in possession." This, no doubt, was according to Mr. Barroll's understanding of the matter. But it will be seen from the admission of the parties, and the papers filed in the cause, that the appellee took possession on the 21st of May 1846, in pursuance of an order from J. H. Stimpson; whilst the contract signed by Mrs. Caton, is dated ——— July 1846. The admission alluded to is:

"It is further admitted, that the order herewith filed (marked 'A.,') directing the surrender of the property in question to William H. Carpenter, was signed by said Stimpson, and delivered to said William H. Carpenter at the date thereof, who received immediate possession in pursuance of it."

The following is the order "A.," referred to: "Messrs. Herbert and Smith, will please surrender the part of lot No. 116, containing 90¾ acres, to Mr. W. H. Carpenter, to whom it has been leased for 99 years, and oblige yours,

May 21st 1846.        ∘                          MARY CATON.

Per, *James H. Stimpson.*"

This order itself, is not a lease for ninety-nine years, nor is it an agreement for a lease for that term, such as a court of equity would enforce against the appellants by a decree for specific performance. If for no other reason, it is defective in not showing what rent was to be paid. Nevertheless the admission is, that in *pursuance of it*, Carpenter took possession immediately after its date. And surely the possession so taken in *May*, cannot, with propriety, be regarded as showing that his subsequent holding was under the contract of *July*, with the authority of Mrs. Caton, or as evidence that she intended that contract should be binding between the parties, without Carpenter's signature, when the form of the instrument showed it was prepared for both to sign, and in the absence of proof of its delivery, or of any intention to deliver it, in its inchoate state; and when by its terms the rent was not to commence until the 1st of January following; before which time she died. It is also proper here to remark, the language of the instrument cannot be considered as indicating a design that the tenancy, supposed to be created by it, should begin at an earlier date than when the rent was to commence.

The record contains an admission, "that some time after the death of Mrs. Mary Caton, certain of the property which descended to her daughters as tenants in common, was assessed and described and divided, in and upon certain schedules and plats filed in the court of chancery, in a cause wherein the Marchioness of Wellesly and others, were complainants, and Emily McTavish and others, were defendants, and that certain portions of said property, were by a decree of said court passed at June term 1851, in said cause, vested in John E. Howard, as trustee of said Lady Stafford, one of the daughters of said Mary Caton, and that among the property so described, the property now in question is described in schedule

B. B., as 'in the tenancy of said William H. Carpenter, for the term of ninety-nine years, at an average rent of two hundred and nineteen dollars and eighty-three cents, yearly, and payable in the months of January and July.' And it is also admitted, that said property so described, is a portion of that which was allotted to John E. Howard, as trustee aforesaid, by the aforesaid decree, and that said Lady Stafford was a party to said proceedings."

In view of these admissions, it is contended, that Lady Stafford, is estopped from denying that Carpenter is lessee under the agreement in question, he being described as such in the proceedings under which she claims. But those proceedings only assigned to her, in severalty, by partition, property previously held by her in common with others, under a title not derived through the partition case. And such a description of the property in such a case, the appellee not being a party to the same, we do not think can estop Lady Stafford from relying upon defects in the title of the appellee, as a tenant for ninety-nine years, when it is perfectly manifest from his bill and evidence, that the foundation of the title claimed by him, is based upon an instrument, which appears upon its face to be defective as a lease for the term he claims. In regard to the principles regulating estoppels, see *Alexander vs. Walter, et al., Lessee,* 8 *Gill,* 248. *Isaac vs. Williams,* 3 *Gill,* 288.

Although the description of the property in the partition case, was an admission by the parties that it was in the tenancy of Carpenter, still that admission was not such an acquiescence in the contract of July 1846, as would amount to a ratification or confirmation of it. To give it such an effect, it was necessary that those making the admission should have had full knowledge of all the facts affecting their rights.

In *Gray vs. Murray,* 3 *Johns. Ch. Rep.,* 188, Chancellor Kent says, "it is a well established, as well as a most reasonable principle, that to constitute a confirmation, the party confirming must be fully apprized of his rights."

In *Flagg vs. Mann, et al.,* 2 *Sumner,* 563, Judge Story says: "The doctrine stated at the bar is well founded, that, in

order to make such an acquiescence binding on Flagg, it should be proved, that he had full knowledge of all the facts affecting his legal and equitable rights; and that, with such knowledge, he did some open unequivocal act, confirmatory of or recognizing the validity of Fuller's title; or that by his silence the latter was purposely and injuriously misled into the belief, that his title was valid, and that Flagg did not mean to controvert it." See also *Owings vs. Hull,* 9 *Peters' S. C. Rep.,* 629.

In *Bennett vs. Colley,* 2 *Mylne & Keene,* 225, (7 *Eng. Ch. R.,* 347,) the Lord Chancellor says, "it can never be maintained, that the acquiescence of a party, under ignorance of his rights, operates as a waiver of any claim, or as a confirmation of any thing done against him. Neither can it be seriously contended, that the proof of ignorance, or want of notice, lies on the party against whom such acquiescence is alleged."

In *Shannon vs. Bradstreet,* 1 *Schoales & Lefroy,* 52, 73, the Lord Chancellor mentions the fact, that the remainder-man had knowledge of the agreement under which the tenant held the premises; and that he also knew the money had been laid out in improvements.

According to *Bennett vs. Colley,* proof of ignorance, or want of full knowledge of the facts connected with the contract of July 1846, does not lie upon Lady Stafford. And it may very correctly be said, the circumstances disclosed do not warrant the conclusion, that she had such full knowledge of the nature of the paper dated —— July 1846, and of the matters relating thereto, as will render the admission in the particular case, in regard to the tenancy of Carpenter, a confirmation of his title under the contract relied upon by him. The instrument was never put upon record. Lady Stafford lived in England, and so did two of her sisters. The bill states that the contract had been lost or mislaid by Mrs. Caton or her agents, and could not be found for a long period after her death.

According to the bill, it appears that "the trustees in whom the property was intended to be vested, refused to accept said

trust, and that no trustee was in existence competent in law to act in the premises, until within a short period, when the appointment of the said John Eager Howard was made by the High Court of Chancery, as aforesaid." We understand Mr. Howard's appointment was by the decree of June term 1851, in the partition case.

The declarations and conduct of Mr. Pennington, in regard to the trusteeship, when considered in connection with what is said in the bill, in reference to the refusal of the trustees to accept, show that he did not consider himself as a trustee having authority to act in the premises. When requested to receive the rent, he declined, saying "that he had prepared a deed creating himself a trustee, which he was about to send over to England to be executed by Lady Stafford and her sisters, Mrs. Caton's daughters; that when that deed was executed, it would be time enough to pay the rent and get the lease." Subsequently he said: "They refused to execute the deed to him, and his agency and attorneyship ceased." Under those circumstances he should not be considered an existing and acting trustee in regard to the premises in question, so that his declarations should be binding upon Lady Stafford and her sisters. And conceding that for them Mr. Pennington was attorney, when, according to the evidence, he is said to have stated, "He was aware of the existence of Mr. Carpenter's contract, had seen it, and that it would be respected." And admitting that Mr. Lucas was solicitor for the defendants when he is said to have lent to Mr. Barroll the paper in dispute, "as the contract between the parties," still the proof in the cause, in reference to what Mr. Pennington said, and what was said or done by Mr. Lucas, cannot render, or assist in rendering valid and binding upon their clients, the paper of July 1846. An attorney, either at law or in fact, has no authority either to make a lease, or to ratify or confirm an imperfect one, or to perfect an inchoate agreement for a lease of property of his principal or client, unless authority for such purpose is expressly given. In relation to the powers of an attorney, see _Doub vs. Barnes_, 1 _Md. Ch. Dec._, 133, and _same case_ in 4 _Gill_, 20. _White vs. Davidson_, 8 _Md. Rep._, 186.

36    v 11

The appellee has contended that, conceding Mrs. Caton had but a life-estate with a *power*, and that there has not been a complete execution of the power, still he insists he has a right to claim that the contract shall be carried into effect, notwithstanding it may be a defective execution of the power. If, however, Mrs. Caton's title to the property in question, under the deed, should be considered as a life-estate, with a power of leasing, we do not regard the circumstances as presenting a question either in relation to a complete or to a defective execution of a power; but in our view of the matter, the case should more appropriately be considered as one in which there has been a *non-execution* of a power.

In 4 *Greenleaf's Cruise on Real Property, marginal page* 229, *title deed, ch.* 18, *sec.* 25, it is said: "Although a court of equity will, in many instances, aid a *defective execution* of a power, yet it will *never interpose in the case of a non-execution of a power;* which always leaves it to the free will and election of the party to whom the power is given, either to execute it or not. For which reason equity will not say he shall execute it, or do that for him which he does not think fit to do for himself. And the intervention of death between a man's resolving to execute a power, and his actually executing it, is not of itself, even in cases where the act is of such a nature as a man is under an obligation to perform, a ground for the interposition of a court of equity in favor of the person intended to have been benefited by the doing thereof, although some steps be taken towards completing such intention."

Formerly, in England, an opinion prevailed, that unless the title of a lessee under a power was effectually made, by a complete and perfect execution of the power, the right of a remainder-man to possess the estate free from the lease, would take place of the right of the lessee, as superior to it. And that, in such a case, the lessee had no claim to any equitable interposition in his favor, but his title could only rest on the legal execution of the power. 2 *Sugd. on Pow., marg. page* 144. 16 *Law Lib.*, 80. But this doctrine has been modified, and courts of equity have granted relief to lessees against remainder-men, in cases depending upon equitable circumstances.

Howard, *et al.*, *vs.* Carpenter.

*Shannon vs. Bradstreet* has been much relied upon for sustaining the title of the appellee to relief in equity.   That case, however, is essentially different from the present.   There, Sir Samuel Bradstreet had a life-estate, with a power to lease.   In 1790, he entered into a treaty with Shannon, the plaintiff, to demise to him the lands in question, and an agreement was made for a lease to the plaintiff for the term of thirty-one years, from the first of November 1790, at the yearly rent of £7 per acre, for such number of acres as the lands should be found to contain, upon a survey thereof; the lease to contain the usual covenants between landlord and tenant, and also a covenant that the plaintiff should, within three years, lay out £200 in buildings and permanent improvements.   A draft of a lease, pursuant to this agreement, was prepared by the plaintiff and submitted to Sir Samuel, who made some few alterations therein, and returned it, with the following endorsement, in his own handwriting:

"I approve of this draft, until a survey can be had, so as to ascertain the rent.   Mr. Shannon may execute a short memorandum to me, according to the terms of this draft, and may have immediate possession.

29th October 1790.                                    S. B."

A memorandum was accordingly prepared, (but whether by Sir Samuel, or by the plaintiff, did not appear,) it was signed by the plaintiff and delivered to Sir Samuel, who delivered a copy or abstract of it, in his own handwriting, to the plaintiff, the original remaining in the custody of Sir Samuel.   The memorandum was consistent with the agreement already stated.

*Immediately after the execution of the memorandum, the plaintiff entered into possession,* and subsequently laid out more than £200 in improvements.   No leases were ever executed.

In May 1792, Sir Samuel died, leaving the defendant, Sir Simon Bradstreet, his eldest son, and entitled to an estate-tail in the lands in question.   The defendant came of age in November 1792, up to which time the rent was paid to his mother and guardian, by the plaintiff, and afterwards it continued to

be paid by the plaintiff to the agents of the defendant, until November 1801, when a notice to quit was given, and in 1802 an ejectment was brought; after which Shannon filed his bill, and obtained an injunction.

For nine years after the remainder-man arrived at age, the rents were received by his agents, without his making any objection, during that time, to the tenant's right to the premises, although before and after his arrival at age, he had a knowledge of the agreement under which the tenant held the premises. And speaking (on page 73) of the money expended in improvements, the Lord Chancellor says, it would be absurd to suppose it was not laid out on the faith of the agreement. There seemed to be some doubt, or controversy, whether this money had been laid out till 1794; the Lord Chancellor, however, rather thought it was expended before. Entertaining this belief, he says: "But if not laid out till then, it was laid out in confidence of the defendant's acquiescence in the agreement, and, I think, rather strengthens the case of the plaintiff. It appears that the defendant knew the money was laid out; if he meant to avoid the agreement, he ought to have given the tenant *immediate notice*, and it strikes me that his not doing so, might form a distinct ground of equity against Sir Simon Bradstreet."

In the present case, not one dollar of rent was paid to Mrs. Caton, nor has any rent been received by either of her daughters, or by any one for them, or for either of them. And it is certain that neither before nor since the decease of Mrs. Caton, has the appellee expended upon the premises in question any money, either in buildings or other improvements. We need look no further than the bill itself, for the correctness of this remark. The appellee there alleges his belief "that by law he cannot be made to pay, and ought not to pay, rent for the said land for a period when, by reason of the cloud upon his title, and the great uncertainty of his getting a title thereto, the land was idle, and wholly useless and unprofitable to him." And this uncertainty in regard to getting a title, is relied upon as an excuse for his not having erected the building on the premises, according to the terms of the contract.

In our opinion, the complainant is not entitled to the relief he asks; therefore the decree below will be reversed, the injunction dissolved, and the bill dismissed, with costs to the appellants in both courts.

*Decree reversed, injunction dissolved,*
*and bill dismissed.*